van Gestel, J.
This matter is before the Court for findings of fact, rulings of law and an order for judgment following a jury-waived trial.
FINDINGS OF FACT
The plaintiff, Jeffrey M. Conklin (“Conklin”), at the time of the start of the trial on June 18, 2002, was unemployed. He is a graduate of Boston College and holds a J.D. degree from Villanova University and an M.B.A. degree from Duke University.
Conklin worked for a number of years, from 1979 to 1993, at Digital Equipment Corporation (“DEC”). He started at DEC as a contract negotiator and advanced through a position as legal counsel for international purchasing to legal counsel for international matters in the financial area.
The defendant, Beth A. Perdue (“Perdue”), is a graduate of Case Western Reserve University and has a law degree from the University of Michigan. She also worked for a number of years at DEC, in the purchasing and contracts department.
While at DEC, Conklin met Perdue. They developed a personal, as well as business, relationship that included some international overlap.
Perdue left DEC in 1992, and Conklin resigned from DEC on June 4, 1993. In 1993, the two then determined to join together and establish a consulting firm to advise businesses on strategic alliances. “Strategic alliances” was a catch phrase that covered a range of activities designed to establish more positive relationships between businesses or between businesses and markets. Conklin and Perdue hoped to capitalize on their experience at DEC in understanding the intricacies of negotiating international agreements and on their knowledge of international markets, particularly in south Asia.
The entity that they formed eventually became CPIntemational, Inc. (“CPI”). The “CP” stood for Conklin and Perdue.
CPI was a Massachusetts corporation which, for taxing purposes, made an election to be treated as a Subchapter S corporation. Conklin and Perdue were each directors, officers and 50% shareholders of CPI. Perdue was the president, and Conklin was the treasurer. CPI, with its two shareholders, an absence of any market for its stock, and its essentially total shareholder participation in management was a classic closely held corporation of the kind described in Donahue v. Rodd Electrotype Company of New England, Inc., 367 Mass. 578 (1975).
CPI had no capital in the beginning and, although it earned small amounts of money on a few contracts, was basically financed by Conklin, either personally or with money he borrowed from his parents. Perdue made essentially no capital contributions to CPI.
Each of Conklin and Perdue reimbursed themselves for expenses, the largest amount of which seemed to be related to international travel to countries in south Asia. Conklin and Perdue also each took from CPI what they called a “draw.” One of the issues in dispute in this case is whether that draw should actually be considered a loan. The Court finds, however, that CPI’s final Federal tax return, for the year 1997, includes a Schedule K-1 in the name of Perdue, listing “Property distributions (including cash) . . . reported to [her] on Form 1099" of$112,434.This$112,434amountisthe ’’draw" in contest. Perdue produced her own individual tax return establishing that she paid taxes on this amount.
In October of 1994, Conklin was invited to make a speech in India before the U.S./India Business Council. The U.S. Secretary of Commerce, the late Ron Brown, led the United States delegation to India in connection with the program. It being customary to give symbolic gifts in connection with such trade mission affairs, Conklin and Perdue suggested that the gift be an Internet web-page to the people of India; the web-page would demonstrate ways in which American and Indian businesses could locate, communicate and collaborate with each other. The idea was accepted, and CPI set about creating a demonstration web-page.
Because CPI had no funds to create such a web-page, it put together a consortium of four American Companies — IBM, BBN, Sun Microsystems and Bay Networks — to fund the creation of the demonstration web-page. The total funding was about $60,000. What was created was an example of how the sponsoring companies’ products could be used in India. The demonstration piece had no interactive functions. The program ultimately became known at CPI as ‘Tradelnfo.”
The trade mission to India was not a success. It came at the time of a fund-raising scandal implicating the Secretary of Commerce. CPI got no follow-on consulting business from this program.
CPI did, however, make contact with the Confederation of Indian Industries (“CII”). The two entities entered into a promotional agreement whereby the CII membership list was to be put on the CPI Tradelnfo program. The idea was that American companies would use the Tradelnfo program with the CII database to make business-to-business contacts in India. CPI hoped that once those contacts were made, *293 it would then be engaged by the American companies for consulting work in their negotiations of agreements with the Indian companies. In a direct sense, this program between CPI and CII was non-revenue generating and actually cost CPI some money.
In the summer of 1995, CPI started on theTradelnfo project with the CII database by beginning to create another canned demonstration similar to that used in the Indian trade mission program. CPI, which was running out of money at the time, engaged a small company in New York named Cyber House Publishing (“Cyber House”) to create a web site. The web site was intended to permit U.S. companies to search the CII database for Indian companies and then call CPI for assistance in getting together.
This clearly was not a large project. Cyber House’s billings only totaled $4,800. But, as an example of CPI’s strained financial circumstances, even that amount was not fully paid.
What Cyber House created, however, could be accessed only by contacting Cyber House. It was, basically, a low-level protoiype with no Internet address. It had no software systems, nor was it interactive or able to perform business-to-business communications.
By the end of 1995, CPI was essentially out of money, and it had only one customer, a company called HCL, which wás overdue on its payments. Tensions arose between Conklin and Perdue. Conklin continued to be the sole source of money to finance CPI, and he was concerned that Perdue was not focusing adequately on the financial end of the business, nor was she contributing to it. In fact, Conklin was concerned that Perdue was an economic drain on the company.
Also by the end of 1995, CPI was located in leased space at 36 Newbury Street in Boston’s Back Bay. The rent was $ 1,650 per month, and Conklin alone was on the lease as a guarantor.
Conklin claims — and Perdue denies the claim — that in the summer of 1995 he had her sign a promissory note reflecting the indebtedness she owed the company for the draw money she was taking. Conklin says that the note was provided to him by the company’s accountants and that Perdue executed two copies thereof. He testified that he then put the two signed copies of the note in a manila envelope which he thereafter kept in a drawer of his desk. No such promissory note, nor any copy thereof, was produced at trial.
By late December 1995, Conklin concluded that CPI was not economically sustainable and had no good future prospects. He also decided that working with Perdue was difficult; and he was tired of all of the traveling.
Thus, on December 29, 1995, Conklin called Per-due and told her things were not working out; that he was in debt, and there was no security for it; and that CPI had no revenue prospects. He further told her that the 50/50 arrangement was not working out and said that he would sit down and discuss the matter with her on the day after New Year’s Day.
Perdue’s response was that she was “shocked.” To which Conklin responded: “How can you be shocked?”
Conklin then went away for the New Year’s weekend. When he returned home from the weekend, there was a voice-mail message from Perdue. It said: “I’m not going to meet. I took some records. I’ll copy them and return them.”
Conklin then called Perdue, and they had a brief, five-minute conversation. In the conversation, Perdue insisted that she had a legal right to do what she did. This time it was Conklin who said he was “stunned.”
Conklin went to the CPI office the next day and met with the office manager, Astrid Mueller. He described the office as appearing as if it had been ransacked and looking like it had been broken into. Folders were all over the place, a computer printer was missing, and computer tapes had been taken. He also says he discovered that the promissory notes and his tax returns were no longer there.
Conklin then called Perdue and demanded that she bring everything back. She refused. He then proceeded to have the locks changed on the office doors.
However, Perdue describes the visit to the office on the New Year’s weekend, and the removal of materials, somewhat differently. She says that she went to the office on Saturday, December 30, 1995, the morning after the telephone conversation with Conklin. She says that she first started to do a back-up of the computer system. She then started going through files, wondering what to take to protect the company. She says she left notes of what she had done. She specifically denies, however, taking any promissory notes — insisting that she never signed any in the first place.
Perdue concedes that on December 30, 1995, she had help from a man named Lawrence Hartford (“Hartford”) in removing the files and other materials from the CPI office.
Hartford also testified about the New Year’s weekend incidents — he says there were two — when he assisted Perdue in removing things from the CPI office. His story strained credulity. He described himself as a “decorative painter” who met Perdue in 1992. He evidently worked from time to time at Perdue’s home, doing what sounded like interior decorating work. Hartford says he became friends with Perdue socially.
Hartford claims he received a call from Perdue on the Friday starting New Year’s weekend,[3] asking for help in removing her “stuff’ from the CPI office because she was going to be locked out. Hartford then says that he picked Perdue up at her home in the South End and drove to Newbury Street, arriving there *294 at about 10:00 p.m. He then alleges that they entered the building and went up the elevator to the CPI office. There, he claims, Perdue unlocked the door, and the two of them went in. He also testified that, at Perdue’s insistence, they did not put on any lights in the office because she did not want Conklin to know she was there. Then, according to Hartford, in the dark of a winter night in Boston, he and Perdue examined materials on her desk and on a secretary’s desk, but Perdue took nothing therefrom, including such highly personal things as photographs of Perdue’s nieces and a radio headset. Then, still in pitch dark, Hartford claims to have gone over to Conklin’s desk and found a manila envelope containing two identical pages headed “promissory note.” He says that he then said to Perdue: “Isn’t this it?” To which he says she responded: “We should go”; and, presumably, taking nothing but the manila envelope and its contents, they left.
Hartford then says that he received a second call from Perdue on Saturday morning, as a result of which they again went to the CPI offices and removed the materials that Perdue also described in her testimony as having been removed on December 30, 1995. The materials removed on Saturday were taken by Hartford and Perdue to “Office Max” at the South Bay Center for copying. They were signed in under the name “J. Hartford” rather than Perdue in order to further conceal their whereabouts from Conklin. Eventually, Hartford says that he and Conklin picked up the copied materials from Office Max and took them to her home in the South End. They used two cars this time because of the documents’ bulk after copying.
The Court does not credit Hartford’s testimony about the dark-of-night visit to the CPI office on Friday, December 29, 1995.
From the time of the New Year’s weekend on, there initially was some effort by Conklin and Perdue to reach agreement on resolving the break-up of their relationship and resolving the affairs of CPI. Except for a few conversations and exchanges of correspondence regarding dissolution in early January 1996, however, there were no apparent efforts by either Conklin or Perdue — both law school graduates — to comply with the legal particulars regarding the winding-up of CPI’s corporate affairs.
Conklin, at the same time, began a new venture on his own. On January 4, 1996, he incorporated Emerging Markets, Inc., known sometimes as Emerging Markets Business Information Services, Inc., later as TradeAccess, Inc., and now as Ozro, Inc. (herein “TradeAccess”). Conklin says the initial incorporation was simply to keep track of what he was going to do.
In an exchange of correspondence on January 15, January 17 and January 19, 1996, Conklin and Per-due reached the point where each was doing little but making accusations about the other regarding the business of CPI, and each was refusing to consent to any action by the other regarding the ongoing business of CPI or its winding-up. Also, on January 15, 1996, the small paid staff of CPI was laid off. This was the beginning of a process when each of Conklin and Perdue made allegations against the other, both in the nature of causing harm to CPI and in the nature of breaching fiduciary duties to each other. The business divorce had begun in earnest and eventually found its way, as most divorces do, into the hands of a judge for resolution of issues colored much more by emotion than economic or business reality.
The principal disagreements between Conklin and Perdue related to his allegations that Perdue’s draw money was in fact a loan from the corporation and her’s that Conklin, in his new venture, effectively stole corporate opportunities that belonged to CPI. Both of these issues are really derivative claims of CPI, the corporation, not of Conklin or Perdue as individuals.
For about two years thereafter, Conklin worked to make his new entity, TradeAccess, succeed. He failed, however. In the process, there was no credible evidence that he took or used materials or opportunities that belonged to CPI. He was, of course, technically still a shareholder and officer of CPI and had whatever duties that status conveyed upon him, assuming CPI remained active for such purposes.
Perdue, despite the aggressive tone in her January 1996 letters, remained remarkably passive, to the state of being essentially inactive, in any attempt to move forward with the business of CPI. Conklin, having moved on with TradeAccess, for all intents and purposes abandoned CPI to Perdue.
To be sure, of course, there were the frictions that came from communications between Conklin and entities with which he, while at CPI, had been involved. These problems mostly produced suspicions and accusations on Perdue’s part that Conklin’s attempts to explain his noninvolvement with CPI after January of 1996 were really attempts to destroy CPI and steal its business. This Court does not see them in such a dark light. Obviously, the parties could have accomplished the split-up much better and much more smoothly. But it was their emotional reactions to each other, not their exercise of business thievery or breaches of fiduciary duties, that were in play.
Similar suspicions were what drove the accusations that Conklin, through TradeAccess, was interfering with CPI’s contractual and other advantageous relationships. As a matter of fact, there was nothing that amounted to such interference, and CPI had essentially no contracts to interfere with. TradeAccess, for one thing, was not in the same business as CPI; and, more importantly, there was no evidence that Trade-Access ever succeeded in the marketplace, except possibly for the time when it sought and received patents for its new product.
In the middle of 1998, long after CPI was in a state of total inactivlly and final exhaustion, Conklin, with *295 TradeAccess, came up with a new idea: the ability to negotiate complex business arrangements over the Internet. He then conceived of and had devised a mock-up of how this could be done. He described it as “iterative, multivariate negotiations.” Through the use of this product, businesses would be able to contact each other and effectively negotiate complex transactions over the Internet. Eventually, after reducing his ideas to practice, he — and two others who worked with him — sought and received, starting in October of 2000, four patents on the process. This enabled him to attract some outside financing and seemingly to infuse life into his new business. However, this business too seems to have turned out to be an economic failure.
Significantly for this case, this Court does not find that anything in the patented process developed by Conklin and his associates, starting in 1998 and thereafter, was acquired from or was a continuation of anything that CPI was doing when it was an active corporation prior to the end of 1995. CPI never had a real product, and it certainly never had anything that allowed business-to-business iterative, multivariate negotiations over the Internet. The Patent Office’s examination of prior art, and its conclusion that Conklin and his associates were entitled to four patents, enables a presumption that the patents were valid, and belies any idea that the inventors copied anything from CPI.
RULINGS OF LAW
Much turns on the status of CPI at various times, particularly in early 1996, and the consequent relationships thereto, and to each other, of CPI’s two 50% shareholders, two directors and sole officers, each of the latter of which are Conklin and Perdue. Consequently, the Court first addresses the legal status of CPI as a Massachusetts corporation in January of 1996. In so doing, the Court has been made aware of a decision in the Delaware Chancery Court dealing, with somewhat similar issues involving a Delaware corporation with shareholder, director and officerships quite similar to that of CPI. See Dionisi et al. v. DeCampli et at, 1995 Del. Ch. LEXIS 88 (June 28, 1995).
In Dionisi, Vice-Chancellor Steele was faced with the break-up of a closely held corporation basically involving two graphic designers who, after previous employment at E.I. du Pont de Nemours & Co., got together to form a small, start-up graphic design business. The entity was incorporated under Delaware law, but the parties treated it much like a joint venture. After a short few years, with very marginal economic success, the two founders had a falling out. Just as in this case, the parties in Dionisi sued each other for a wide array of breaches of fiduciary duties, unfair business practices, interference with contractual relations, and the like. Also, just as in this case, the parties in Dionisi did not avail themselves of the provisions of Delaware corporate law to effect the formal dissolution of the entity.
Vice-Chancellor Steele, in Dionisi, took it upon himself to dissolve the entity in the way that either of the parties could have, but failed to do. The Court here quotes from Dionisi at *18-*20 of the LEXIS version thereof:
Section 273 of the Delaware Corporation law provides an expeditious procedure for dissolving a joint corporation having two 50% shareholders . . . This section embodies the public policy that joint venture corporations with two 50% shareholders should follow the procedures established by legislative enactment when the joint venture has come to an end. For indeterminable reasons, neither shareholder chose to do so.
Now, recognizing the realities of the situation, the question is how to end this venture in the most equitable, efficient and inexpensive manner possible. A court of equity will not ignore the practicalities of a situation ... This matter has continued far longer than necessary. The parties should have availed themselves of 8 Del. C. sec. 273 when they knew the joint venture had ended. Eight years after the fact, the parties now ask the Court to resolve their differences, with their ex post facto actions and rationalizations.
The legislature’s pronouncement of how joint ventures should be dissolved, with its incorporated public policy, will be the tool I use to bring this matter to a fair and expeditious end. I will not overlook this integral section of our corporate law merely because neither party filed a petition. Equity regards as done that which in good conscience the parties should have done . . . [The parties] never formally agreed how this joint venture would conclude its affairs. The parties, who were deadlocked concerning the operation of the joint venture should have filed for dissolution under 8 Del. C. sec. 273 as of February 1, 1987. The mere fact that they did not initiate the process as contemplated by the statute and filed suit against each other does not prevent me from seizing the initiative and doing what they should have done.
Section 273(b) grants the Court of Chancery the power to dissolve the corporation ... Exercising my discretion, the equitable power of the court and the authority vested in Del. C. 273(b), I find the corporation should be dissolved, with each party receiving one-half, in relation to each party’s proportion of ownership, of the net book value of the corporation as of February 1, 1987.
This Court finds itself in much the same position as the Delaware Chancery Court in Dionisi CPI has two 50% shareholders, Conklin and Perdue. Conklin and Perdue, unlike the two shareholders in Dionisi were lawyers, not graphic artists. The two sharehold *296 ers here are also the only two directors and the only two executive officers of CPI. Since at least mid-January 1996, Conklin and Perdue have been deadlocked in the management of the corporate affairs of CPI and, as shareholders, have been unable to break the deadlock.
Mass. G.L.c. 156B,[4] Sec. 99, provides in material part as follows:
A petition for dissolution of a corporation may be filed in the supreme judicial court in the following cases:
(b) Such a petition may be filed by the holder or holders of not less than forty per cent of all the shares of its stock outstanding and entitled to vote thereon, treating all classes of stock entitled to vote as a single class for the purpose of determining whether the petition is brought by the holders of not less than forty per cent of the outstanding shares as aforesaid, if:
(1) the directors are deadlocked in the management of corporate affairs, and the shareholders are unable to break the deadlock;
After such notice as the court may order and after hearing, the court may decree a dissolution of the corporation, notwithstanding the fact that the business of the corporation is being conducted at a profit, if it shall find that the best interests of the stockholders will be served by such dissolution. Upon such dissolution, the existence of the corporation shall cease, subject to the provisions of sections one hundred and two, one hundred and four and one hundred and eight.
Section 102 of c. 156B is the provision that provides that dissolution under Sec. 99 shall not prevent the corporation from continuing as a body corporate for a period of three years “for the purpose of prosecuting and defending suits by and against it and/or enabling it gradually to settle and close its affairs, to dispose of and convey its property to any person and to make distributions to its stockholders of any assets remaining after payment of its debts and obligations, but not for the purpose of continuing the business for which it was established.” (Emphasis added.)
Can this Court, like the Delaware Chancery Court in Dionisi, seize upon G.L.c. 156B, Sec. 99, asavehicle provided by the Legislature that enables the Court to do what the parties themselves did not: dissolve CPI because of the deadlock by the directors in the management of the corporation and the inability of the shareholders to break that deadlock? A reading of earlier case law suggests perhaps not. See, e.g., Rizzuto v. Onset Cafe, Inc., 330 Mass. 595, 597-98 (1953); Leventhal v. Atlantic Finance Corp., 316 Mass. 194 (1944).
The Court observes, however, that the earlier cases — at least those pre-Donahue v. Rodd Electrotype of New England, Inc., 367 Mass. 578 (1975) — treated the relationship between shareholders of a closely held corporation vastly differently than was announced, and since followed, in Donahue. See, e.g., Leventhal v. Atlantic Finance Corp., supra, 316 Mass. at 198-99. For that reason alone, this Court places little reliance on those earlier decisions.
More significantly, by the Acts of 1964, Chapter 723, the Commonwealth adopted a new Business Corporation Law, which represented the first general overhaul of the Massachusetts corporate laws since 1903. See Hosmer, New Business Corporation Law, 11 Ann. Survey of Massachusetts Law 1. Mr. Hosmer, Chairman of the Boston Bar Association Committee that drafted the new business corporation laws, noted that “Chapter 156B [in sec. 99] clarifies the deadlock situation for voluntaiy dissolution by adopting the definitions of the A.B.A. Model Act and deals with the determination of the vote required in case more than one class of stock is outstanding.”
The significance of the new c. 156B to the situation before this Court was presaged, perhaps unknowingly, in Rizzuto v. Onset Cafe, Inc., supra, 330 Mass. at 597-98. There the court said:
The dissolution of corporations, like their creation, is primarily and fundamentally a matter of legislative and not judicial cognizance . . . The allegations of the bill or the findings of the judge do not bring this case within the scope of any statute authorizing judicial dissolution of corporations.
(Emphasis added.)
Here, of course, the findings and rulings of this Court do reveal that, given the deadlock between Conklin and Perdue, the situation does fall within the scope of a statute authorizing judicial dissolution — a statute that was enacted after Rizzuto and was a new provision in the General Laws.
The dissolution of a corporation under c. 156B, Sec. 99 calls for the Court to apply its equitable powers. Prior to the adoption of the Massachusetts Rules of Civil Procedure in 1974, corporate dissolution proceedings generally were brought by a bill in equity. See, e.g., Zottu v. Electronic Heating Corp., 334 Mass. 442 (1956). Indeed, Sec. 99 states that the result of a proceeding thereunder is for the Court to “decree a dissolution of the corporation.” (Emphasis added.) At the time that c. 156B was enacted, “decrees” were the vehicle for resolution of matters on the equity side of the court, just as “judgments” were the vehicle on the law side. Further, the Massachusetts Rules of Civil Procedure do not apply “to proceedings pertaining to the dissolution of corporations and distribution of their assets.” Mass.R.Civ.P. Rule 81(a)(1)6.
*297 Given all of the foregoing, this Court, believing it to be within its equitable powers, will proceed here, like the Chancery Court in Dionisi, to address the dissolution of CPI, as Conklin or Perdue should have done, under G.L.c. 156B, Sec. 99. In doing so, the Court must first determine when the requisite deadlock between the directors and shareholders first occurred.
As noted in the findings, there was a period from December 29, 1995 through mid-Januaiy 1996, when Conklin and Perdue — although in great discord and disarray emotionally, physically, legally and otherwise — seemed to be coming to grips with the termination of their relationship and the dissolution of CPI. Those efforts, however, erupted and imploded with the exchange of correspondence on January 15, January 17 and January 19, 1996. In that exchange, the efforts at resolution metamorphosed into recriminations and accusations, with each of Conklin and Perdue telling the other that he or she would not consent to any action the other took with regard to CPI, its business or its dissolution. The requisite deadlock had arrived, and Conklin and Perdue — CPI’s sole 50% shareholders — were unable to break the deadlock. Thus, this Court, acting pursuant to its inherent equitable powers and the authority vested in G.L.c. 156B, Sec. 99, hereby determines that January 19, 1996 is the day that Conklin and Perdue were first in total deadlock regarding the management of CPI and, therefore, the date upon which the corporation is to be deemed dissolved.
The foregoing ruling on dissolution notwithstanding, CPI must be considered to have continued as a body corporate for a period of three years “for the purpose of prosecuting and defending suits by and against it and or enabling it gradually to settle and close its affairs, to dispose of and convey its property to any person and to make distributions to its stockholders of any assets remaining after payment of its debts and obligations, but not for the purpose of continuing the business for which it was established.” G.L.c. 156B, Sec. 102. See Zottu v. Electronic Heating Corp., supra, 334 Mass. at 445.
Many of the claims pursued in this litigation, by both sides, belong to CPI and not to the individual shareholders. See Pagounis v. Pendleton, 52 Mass.App.Ct. 270, 275 (2001).
Both Conklin and Perdue in fact do bring some of their claims derivatively on behalf of CPI. Ordinarily, in order to bring a corporate derivative claim, the corporation itself must be joined as a party defendant. Id. at n.6. Perdue did so when she named CPI among the third-party defendants. Conklin, however, only included CPI with him as a party plaintiff. Whatever deficiency this might provide in the ordinary case is not significant here. The purpose for naming the corporation in a derivative action is that it has an interest in the result and thus should be a party bound by the Court’s decision. See, e.g., Turner v. United Mineral Land Corp., 308 Mass. 531, 538 (1941). CPI will be bound by the decisions here.
The Court now turns to each of the specific claims and their resolution.
Conklin makes four claims against Perdue: he charges her with money lent (Count I); money had and received (Count II); breach of contract (Count III); and breach of fiduciaiy duty (Count IV).
The first three claims are not Conklin’s personally, but rather derivative claims of the corporation, CPI. All three relate to the issue of whether Perdue’s draw was in reality a loan. On the evidence presented, this Court rules that the draw was compensation and not a loan. While a different conclusion may have been compelled if some written evidence of a loan was presented, or its absence convincingly accounted for, but it was not. Further, the fact that for S corporation tax purposes certain items needed particular handling and characterization does not change the fact. Indeed, the treatment of the K-l for Perdue on the CPI final 1997 tax return, the issuance to her of a tax Form 1099, and her ultimate payment of income tax on the draw demonstrates quite the contrary. Counts I, II and III must be dismissed.
Count IV charges Perdue with breach of her fiduciary duties in the December 30, 1995 removal of corporate files and materials from the office. Given her position as a 50% shareholder, and Conklin’s December 29, 1995 telephone call threat to the effect that CPI was over as a going operation, the charge of a breach is a close one. It need not be resolved, however, because there was no satisfactory evidence of any damage to Conklin or CPI, all of the records ultimately having been returned and always having been in the custody and control of a 50% shareholder, director and corporate officer. Indeed, it is Conklin’s claim — and a major part of his defense to Perdue’s claims — that CPI was effectively without any business or any prospects of business on December 29, 1995. As such, neither he nor the corporation had much, if anything, to lose.
Perdue asserts six claims[5] against Conklin: breach of fiduciaiy duty (First Claim); request for an accounting (Second Claim); constructive trust (Third Claim); interference with business/contractual relations (Fourth Claim); unfair trade practices under G.L.c. 93A (Fifth Claim); and conversion (Sixth Claim).
Any fiduciaiy duty on Conklin’s part ended on January 19, 1996, the date that this Court has ruled was the date of dissolution of the closely held corporation from which those duties flow. To paraphrase the words of Justice Wilkins in Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 694 (1982), “(a)lthough [Conklin’s] conduct would hardly qualify [him] for a ‘sportsmanship’ award and although [Perdue] may reasonably conclude that [she] was treated most *298 unfairly, a decision in [Perdue’s] favor” on this Count is not legally warranted. “A director or officer is not entirely barred from pursuing a corporate opportunity, but a person holding either position cannot do so unlesstheopportunity is first offered to the corporation and rejected by it.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 530 (1997). Here, there is no showing that Conklin, prior to January 19, 1996, took any opportunity of CPI’s that was not first known to and not pursued by it. Nor is there any showing that after January 19, 1996, CPI did, or purported to do, any business, or that Conklin took anything belonging to it thereafter.
As to anything else that may have constituted a breach of his fiduciary duty in the time before January 19, 1996, like with Conklin’s claim against Perdue, there is no evidence of any damages to her by his activities.
The foregoing conclusions with regard to breaches of fiduciary duly by Conklin to Perdue apply with equal force to the Fourth Claim for interference with business/contractual relations which belongs not to her but to CPI. There is no evidence that CPI had any viable business or contractual relations as of January 19, 1996, or that there was any interference with them by that time. Thereafter, having now been deemed dissolved on that date by this Court, CPI only existed after January 19, 1996, for purposes of winding up its affairs and “not for the purpose of continuing the business for which it was established.” G.L.c. 156B, Sec. 102.
Furthermore, there is no evidence of any damages that flowed to CPI as a result of any acts by Conklin for the period leading up to January 19, 1996. See, e.g., Chemawa Country Golf, Inc. v. Wnuk, 9 Mass.App.Ct. 506, 511 (1980). Consequently, CPI cannot be said to have had any business or contractual relations that were interfered with.
The Court turns now to the Second Claim seeking an accounting. There being no breach found in Conklin’s actions, this Court sees no basis for an accounting. What is he to account for? And to whom or what, Perdue or the dissolved CPI? And, after all of the discovery and the trial of the case, no more accounting is needed. The Second Claim must be dismissed.
The Third Claim seeks a constructive trust. Such a trust is a device employed in equity to avoid an unjust enrichment of one party at the expense of another where legal title to properly was obtained by a breach of fiduciary duty or other improper means. Mass. Wholesalers of Malt Beverages, Inc. v. Attorney General, 409 Mass. 336, 342-43 (1991).
Again, like the Fourth Claim, the constructive trust theory seems to relate to claims of CPI, not those of Perdue. CPI having been dissolved as of January 19, 1996, it is not at all apparent what “properly” of CPI Conklin obtained by breach of fiduciary duly or other improper means before that date — or thereafter, for that matter. There is no basis to impose a constructive trust on the evidence presented here.
The Fifth Claim is a claim brought pursuant to G.L.c. 93A. Such a claim by Perdue against Conklin cannot succeed as a matter of law. See Szalla v. Locke, 421 Mass. 448, 451 (1995); Zimmerman v. Bogoff, 402 Mass. 650, 662-63 (1988); Riseman v. Orion Research, Inc., 394 Mass. 311, 313-14 (1985); Newton v. Moffe, 13 Mass.App.Ct. 462, 469-70 (1982).
The final claim, the Sixth Claim, seeks relief for conversion. This too seems more a claim by CPI than that of Perdue personally. To succeed on such a claim, there must be a showing that Conklin intentionally and wrongfully exercised ownership, control or dominion over personal property to which he had no right of possession. See Massachusetts Lubricant Corp. v. Socony-Vacuum Oil Co., 305 Mass. 269, 271-73 (1940).
There was insufficient evidence that Conklin took personal property of either Perdue or CPI. Nor was there any showing of the value of such property from which this Court could make a damages award. The Sixth Claim must be dismissed.
What is left after all of the foregoing is that neither Conklin, Perdue nor CPI are entitled to anything from the other, except that Conklin and Perdue have a theoretical right each to share one-half of the net book value of CPI as of Januaiy 19, 1996. There was, however, no evidence presented as to what that net book value might have been. Indeed, the only credible evidence presented led to the inference that it was essentially zero.
ORDER FOR JUDGMENT
For all of the foregoing reasons, the Court orders the entry of judgment dismissing the plaintiff s complaint and dismissing the defendant’s counterclaims and cross claims, all to be with prejudice and without costs.

The Court takes judicial notice of the fact that in 1995, the last Friday of the month was December 29, 1995, and New Year’s Day was Monday January 1, 1996.

The statute under which CPI was established.

Initially there was a Seventh Claim for infliction of emotional distress. That claim was not argued by Perdue and is presumed waived. In any event it was not proved. See Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).